## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **ANGELA A.,**[1]                ) <br>              ) <br>        **Plaintiff,**  ) <br>              ) <br>    **v.**               ) <br>              ) <br> **MARTIN J. O'MALLEY,**  ) <br> **Commissioner of Social Security,** ) <br>              ) <br>       **Defendant.**  ) | **No. 21 CV 5381** <br><br> **Magistrate Judge Young B. Kim** <br><br><br> **November 14, 2024** |

### MEMORANDUM OPINION and ORDER

Angela A. seeks disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") asserting that she is disabled by diabetes, arthritis, nerve damage in her hands, and back, hip, and shoulder pain. She brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security denying her application for benefits. For the following reasons, Angela's remand request is granted:

### Procedural History

Angela filed DIB and SSI applications in May 2016 claiming a disability onset as of October 1, 2015. (Administrative Record ("A.R.") 218, 225.) After her applications were denied initially and upon reconsideration at the administrative level, (id. at 76-115), she sought and was granted a hearing before an Administrative Law Judge ("ALJ"), (id. at 132-33, 189). Angela appeared with her attorney at an

---

[1] Pursuant to Internal Operating Procedure 22, the court uses Angela's first name and last initial in this opinion to protect her privacy to the extent possible.

April 2018 hearing, at which she and a vocational expert ("VE") testified. (Id. at 30-73.) The ALJ ruled a few months later that Angela was not disabled. (Id. at 10-29.) The Appeals Council denied Angela's request for review, (id. at 1-6), and Angela then sought judicial review in this court, *Angela A. v. Saul*, No. 19 CV 6211, Dkt. 1 (N.D. Ill. Sept. 17, 2019). The government in response agreed to remand the case for a new hearing. *Angela A.*, No. 19 CV 6211, Dkt. 20 (N.D. Ill. May 26, 2020).

The ALJ held a second hearing in December 2020, and Angela appeared with her attorney and she and a VE testified. (A.R. 1088-1146.) At this hearing, Angela amended her petition to seek benefits for a closed period—from her alleged disability onset date of October 1, 2015, through October 1, 2018, (id. at 1094)—because she returned to work at Jewel-Osco as a stock clerk at the end of September 2018, (id. at 1097-99). The ALJ issued a decision in July 2021 again finding that Angela was not disabled. (Id. at 1061-80.) Angela did not file a request for review with the Appeals Council, so the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 404.984. Angela now seeks judicial review of that decision, and the parties consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 7).

## Analysis

Angela argues that the ALJ failed to: (1) support with substantial evidence the step-five finding that Angela could perform a significant number of jobs in the national economy; (2) properly consider the opinion of her treating physician, Dr. Chandrasekhar Sompalli; and (3) adequately assess her subjective symptom statements. (See generally R. 11, Pl.'s Mem.) When reviewing the ALJ's decision,

the court asks only whether the ALJ applied the correct legal standards and whether the decision has the support of substantial evidence, *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019), which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation and citations omitted). This deferential standard precludes the court from reweighing the evidence or substituting its judgment for the ALJ's, allowing reversal "only if the record compels" it. *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (quotation and citation omitted). However, the ALJ must "provide a logical bridge between the evidence and his conclusions." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021) (internal quotation and citation omitted). Put another way, the ALJ's "analysis must say enough to enable a review of whether the ALJ considered the totality of a claimant's limitations." *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021). Having considered the arguments and record under this standard, the court finds remand is warranted here.

## A.     Step-Five Finding

Angela argues that the ALJ erred at step five by finding that she could perform a significant number of jobs in the national economy. (R. 11, Pl.'s Mem. at 4-10.) The government bears the burden at step five of "demonstrating that there are significant numbers of jobs in the national economy for someone with the claimant's abilities and limitations." *Ruenger v. Kijakazi*, 23 F.4th 760, 761 (7th Cir. 2022). To satisfy this burden, the ALJ generally considers testimony from a VE regarding available jobs, *id.*, but may only do so when substantial evidence supports that testimony, *Chavez v.*

3

*Berryhill*, 895 F.3d 962, 963 (7th Cir. 2018). Angela argues that the ALJ erred when accepting the VE's testimony.

The court begins with Angela's contention that the RFC conflicts with the VE's testimony identifying several jobs as suitable "other work." (R. 11, Pl.'s Mem. at 9-10.) ALJs have an "affirmative responsibility" to "ask about any possible conflict" between the VE's testimony and information provided in the Dictionary of Occupational Titles ("DOT"), and to resolve apparent conflicts.[2] *See* Social Security Ruling ("SSR") 00-4p, 2000 WL 1898704, at *4. An "apparent conflict" exists when it is "so obvious that the ALJ should have picked up on [it] without any assistance," *Weatherbee v. Astrue*, 649 F.3d 565, 571-72 (7th Cir. 2011), and must be resolved even if the conflict was not raised at the administrative hearing, *Brown v. Colvin*, 845 F.3d 247, 254-55 (7th Cir. 2016).

In this case, the ALJ assessed an RFC indicating that Angela can perform light work except:

> she can never climb ladders, ropes or scaffolds. She can occasionally stoop, kneel, crouch and crawl. She can frequently handle bilaterally. She can occasionally reach with the non-dominant right upper extremity in all directions except overhead, which she can never do. She can never do overhead lifting.

(A.R. 1066.) The VE testified that a hypothetical person with this RFC could perform occupations such as greeter (90,000 jobs nationwide), school bus monitor (28,000

---

[2] The Seventh Circuit has expressed concern about the "outdated" nature of the DOT. *Ruenger*, 23 F.4th at 761; *see also Daniel L. v. Kijakazi*, No. 22 CV 6976, 2023 WL 5830807, at *9 (N.D. Ill. Sept. 8, 2023) (noting DOT "dates back 46 years to 1977," and based on cases reviewed in this district, VEs have estimated job numbers for the same DOT entry with "massive fluctuations").

jobs), telephone quotation clerk (70,000 jobs), order clerk (24,000 jobs), charge account clerk (38,000 jobs), and photofinishing clerk (26,000 jobs). (Id. at 1127-29.) The ALJ relied on all such positions as suitable "other work" for Angela except for the photofinishing clerk position.

Angela says an apparent conflict exists between the RFC the ALJ assessed and the DOT code cited in his decision. (R. 11, Pl.'s Mem. at 9.) But both the ALJ decision and the VE testimony specifically identified the job of "greeter," and the VE-identified DOT code for that job as 299.677-010, whereas the ALJ cited to 299.667-010. (A.R. 1077, 1127.) The court therefore agrees with the government that the code number in the ALJ's decision is a scrivener's error, (R. 17, Govt.'s Mem. at 13), and there is no apparent conflict between the correct DOT code for the greeter position and Angela's RFC. Indeed, the most Angela could argue is that the RFC's limitations to "occasional" reaching with her non-dominant arm and no overhead reaching conflict with DOT code 299.677-010's "frequent" reaching requirement. *See Sales Attendant*, DOT 299.677-010, 1991 WL 672643 (4th ed. 1991) ("Reaching: Frequently – Exists from 1/3 to 2/3 of the time"). However, Angela makes no such argument, and the government cites authority finding no apparent conflict between a claimant with similar "occasional" limitations on a non-dominant side and no reaching above the shoulder and positions requiring "frequent" reaching. (R. 17, Govt.'s Mem. at 13 (citing *Merritt v. Astrue*, 872 F. Supp. 2d 742, 757 (N.D. Ill. 2012) ("Occasional limitations on the non-dominant side do not so obviously conflict with the description

5

of the . . . positions [requiring frequent reaching and handling] to constitute an apparent conflict.")).)

Angela does argue, however, that her overhead reaching restrictions conflict with three other jobs the ALJ identified in his opinion—school bus monitor, telephone quotation clerk, and order clerk. (R. 11, Pl.'s Mem. at 9-10.) But the school bus monitor description specifically states "Reaching: Not Present – Activity or condition does not exist." *School Bus Monitor*, DOT 372.667-042, 1991 WL 673102 (4th ed. 1991). And while both the telephone quotation clerk and order clerk descriptions call for frequent reaching, *Telephone Quotation Clerk*, DOT 237.367-046, 1991 WL 672194 (4th ed. 1991) ("Reaching: Frequently – Exists from 1/3 to 2/3 of the time"); *Order Clerk*, DOT 209.567-014, 1991 WL 671794 (4th ed. 1991) (same), there is no suggestion in the job descriptions that such reaching is overhead or must be done with a dominant arm, and therefore no apparent conflict exists, *see Merritt*, 872 F. Supp. 2d at 757. In fact, the narrative portion of the telephone quotation clerk job description does not require any reaching.[3] Angela also argues that the order clerk duties "require lifting overhead to post the meal ticket on the line for the line cooks," but the job's narrative does not explicitly say so and in fact allows for the oral

---

[3] The telephone quotation clerk job description provides the following:

> Answers telephone calls from customers requesting current stock quotations and provides information posted on electronic quote board. Relays calls to REGISTERED REPRESENTATIVE (financial) 250.257-018 as requested by customer. May call customers to inform them of stock quotations.

DOT 237.367-046, 1991 WL 672194 (4th ed. 1991).

communication of orders, *Order Clerk*, DOT 209.567.014, 1991 WL 671794 (4th ed. 1991) ("Distributes order tickets or calls out order to kitchen employes."). As such, Angela's "apparent conflict" argument fails.

Angela also complains that the school bus monitor, telephone quotation clerk, and charge account positions are obsolete. (R. 11, Pl.'s Mem. at 9-10.) However, none of these positions is among the 114 jobs the SSA recently deemed obsolete or the 13 positions requiring additional evidence to support existence in significant numbers. *See* Soc. Sec. Admin., Emergency Message (EM) 242026 (June 22, 2024), https://secure.ssa.gov/apps10/reference.nsf/links/06212024021759PM (last visited Nov. 6, 2024) (barring ALJs from citing 114 occupations to support a "not disabled" determination); *see also* Soc. Sec. Admin., EM-24027 (June 22, 2024), https://secure.ssa.gov/apps10/reference.nsf/links/06212024022159PM (last visited Nov. 6, 2024) (barring ALJs from citing 13 occupations to support "not disabled" determination without additional evidence that they exist in significant numbers alone or with other work). Even setting all three such jobs aside, the 90,000 greeter and 24,000 order clerk positions the VE and ALJ identified together more than meet the "significant number" threshold. *See Milhem v. Kijakazi*, 52 F.4th 688, 696-97 (7th Cir. 2022) (holding 89,000 jobs significant and "in accord with numbers of national jobs held to be significant by other circuits") (citing, e.g., *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022) (32,000 national jobs is significant), *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 529 (9th Cir. 2014) (25,000 national jobs), and *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997) (10,000 national jobs)); *see also*

*Akindayo O. I. v. Kijakazi*, No. 20 CV 7777, 2022 WL 3543539, at *3 (N.D. Ill. Aug. 18, 2022) ("Given that four federal appellate courts have found less than 30,000 jobs nationally to be significant, the Court believes the Seventh Circuit would do so as well."); *Alan C. v. Kijakazi*, No. 20 CV 7757, 2023 WL 2915404, at *8 (N.D. Ill. April 12, 2023) (noting authority indicating that 25,000 jobs nationally is significant).[4] In short, while some of the positions the VE and ALJ cited may occur in reduced numbers because of technology advancements or otherwise, a significant number of jobs in the national economy remain even adjusting the VE's estimates.

But Angela's remaining step-five argument has teeth. She argues that the VE did not use a reliable method to arrive at these and the other job number estimates that the ALJ ultimately used to conclude that Angela is not disabled. (R. 11, Pl.'s Mem. at 5-9.) To support the job-number estimate with substantial evidence, the VE must use "a reliable methodology," *Ruenger*, 23 F.4th at 763 (citing *Brace v. Saul*, 970 F.3d 818, 821-22 (7th Cir. 2020)), meaning that the methodology is corroborated by "well-accepted sources" and "cogently and thoroughly" explained, *id.* (citing *Biestek*, 139 S. Ct. at 1155). A VE may use a variety of sources to estimate job numbers,

---

[4] Angela says the government "admits" that the VE "testified the 142,000 jobs for DOT 299.677-010 actually represent[] all the DOT titles within the SOC code 41-2031, which is forty-seven (47)." (R. 18, Pl.'s Reply at 6.) Angela goes on to argue that because there is only one SVP-2 level job among those 47, the appropriate number of "greeter" jobs is closer to 2,000, if applying the equal distribution method. (Id. at 6-7.) But the government makes no such "admission," and the VE did not give such testimony. Instead, the VE and ALJ concluded that 90,000—not 142,000—jobs are attributable to the "greeter" position, (A.R. 1077 and 1127), and the government points out that 142,000 jobs remain even if the charge account clerk and telephone quotation clerk positions are eliminated, (R. 17, Govt.'s Mem. at 14-15).

including the DOT. *Id.* at 761-62. But to calculate the number of positions that exist in the national economy for each such job title, the VE must "convert[] job numbers from the Bureau of Labor Statistics"—which uses the standard occupational classification, or "SOC" system—to the DOT system, *Chavez v. O'Malley*, 96 F.4th 1016, 1022 (7th Cir. 2024). Because "SOC codes sort jobs into broad occupational categories" encompassing "multiple DOT job titles," they allow a VE to "identify the number of jobs in the larger SOC grouping but [not] how those jobs are distributed among individual DOT job titles within that grouping." *Ruenger*, 23 F.4th at 762. Thus, "a critical aspect of the [VE's] job estimation process is how that expert matches general economic data reported in SOC codes to specific DOT numbers used by the agency." *Chavez*, 96 F.4th at 1022; *see also Brace*, 970 F.3d at 821 (noting that "expert's methodology for connecting job titles to reliable estimates of the number of jobs for each title is especially important").

As discussed, the VE gave several examples of occupations available to a hypothetical person with Angela's RFC, including photofinishing clerk (approximately 26,000 jobs nationwide). (A.R. 1127-29.) But ultimately the ALJ did not rely on that job because of the VE's testimony regarding source and methodology for his estimate. (Id. at 1138.) Among other things, the VE initially testified incorrectly that the Bureau of Labor Statistics ("BLS") provides job number estimates that correspond with the DOT code:

> ATTY:     So, what's the source then of your 26,000 [photofinishing clerk] jobs?

| | |
|---|---|
| VE: | It's the [BLS]. They do an occupational employment survey, and this would be numbers from May of 2019. |
| ATTY: | Okay. So, how many – but the [BLS] is giving numbers for the either OES and SOC code, correct? |
| VE: | Yes, it's the DOT numbers within the SOC codes. |
| ATTY: | So, the [BLS] does not give numbers according to the DOT code. Is that correct? |
| VE: | Yes, they do. |
| ATTY: | The [BLS] provides job numbers . . . in reference to the DOT code? |
| VE: | Yes, they do, that's on OccuBrowse. Yes. . . . |
| ATTY: | Your Honor, . . . I do not believe the [BLS] divides DOT numbers, otherwise there would be no need for an expert. I don't know what to say here, I'm sort of at a loss. Can you provide some administrative notice here? |
| ALJ: | Well, I mean, he's saying that BLS provides numbers tied to the SOC codes, correct? |
| VE: | To the SOC codes, that's correct. . . . |
| ATTY: | So, Mr. Paul, let me ask again. Does the [BLS] provide job numbers according to their DOT code? |
| VE: | No, the SOC codes. |

(Id. at 1132-33.) After clarifying the VE's testimony, Angela's attorney pressed the VE to explain how he arrived at his estimate of 26,000 jobs for the DOT code associated with the photofinishing clerk job when the corresponding SOC code encompassed 24 different DOT codes accounting for 411,560 total jobs:

| | |
|---|---|
| ATTY: | So, how then did you get from [411,560] jobs to 26,000? |

VE:        I viewed all the occupations and based on my 32 years of helping injured workers return to work, I assign values to each one of those occupations. . . .  Can you hurry up, please?  I have to hit the restroom, so.

ATTY:      I'm happy to wait for you to use the restroom, I don't want you to feel rushed in your answers.

ALJ:       Yeah, do you want to take a quick break?  I'm happy to pause.

VE:        No, that's all right, I'll continue here.  I just don't want it to last another hour. . . .

ATTY:      Okay.  What makes 26,000 a decent estimation based on your 30 years of personal experience?  Is there –

VE:        [I]t's based on the total number of jobs and based on the other occupations.  Some of them have a lot less of a total in the national economy.  And it was my feeling that 26,000 was a fair number for this particular occupation.

ATTY:      But your feeling is based on what?  So, for example –

ALJ:       I think you've asked it and he's answered it, I mean, you know . . . .  I don't know what more –

ATTY:      Well, so for example, what percentage of the DOT codes within this list of 25 that you said fall within the parameter of the hypothetical?  So, out of those 25, how many of them are in line with the hypothetical that the Judge gave?

VE:        I would consider all of them.

ATTY:      Even the ones that are medium, SVP: 4, or the ones that are light, SVP: 5?

VE:        No, well, not those. . . .

ATTY:      [S]o your testimony now has changed so it's not all of them reflect the hypothetical from number one.  So, how many of the 25 do reflect the hypothetical from number one?

VE:        All of those that are light in . . . .  There's a few medium ones, but most of them are light.  And they'd be . . . .  And the SVP would be 2. . . .  So there's not many. . . .

ATTY:      Okay.  So, is your testimony that only the jobs that are light and SVP: 2 or sedentary and SVP: 2 would reflect the hypothetical?  Or I guess if they're SVP: 1, SVP: 2 –

VE:        Correct.

ATTY:      Okay.  So, how many of the jobs then are light, SVP: 2 out of the 25?

VE:        One, two, three, four, five, six, let's see, I think there's eight. . . .  Eight out of 24, it's exactly a third.

ATTY:      Okay.  So, then . . . what methodology then besides just counting on 30 years of experience did you do to –

ALJ:        You've asked, he's answered; he gave you the methodology.  And he's –

VE:        Yes, I gave you –

ATTY:      No, he referred to his sources. . . .

ALJ:        You know, he answered the question and, you know, you don't have to like his answer.  And if you have an argument for appeal, but . . . I think you know that there's really not more he can say. . . .  You know, I'll stipulate right now that I won't use photofinishing counter clerk. . . .

ATTY:      I appreciate that, Your Honor.

(Id. at 1134-38.)  Angela's attorney then asked the ALJ whether he understood and could explain the VE's testimony regarding the methodology:

ATTY:      [A]re you able to differentiate . . . between the source of the [VE's] estimations and the method of the estimation?  Because I'm not. . . .  But if you are, then I can just have you explain it to me and you're right, I can get off this topic.

ALJ:        You're asking me?

ATTY:        Yes, are you able – do you feel that he provided enough for you that you can describe to me his methodology for the job estimates?

ALJ:        I think that's up to him and he's described the methodology.

(Id. at 1139-40.)

Moving on to school bus monitor, the VE testified that he was not aware of any school with a full-time school bus monitor "off the top of [his] head," but that the applicable SOC code encompassed five DOT codes and 146,000 jobs in total, and he "felt" that 28,000 was a "fair number" for school bus monitor. (Id. at 1140-41.) Angela's attorney again asked about the methodology:

ATTY:        [I]s there anything that you're relying on besides your feelings about the jobs for the numbers that you gave to reflect the DOT codes?

ALJ:        [L]ook, Counsel, he didn't say feeling. He said it's based on the [BLS], and it's based on an estimate of the total numbers of jobs given under that SOC code. And so . . . he's making an estimate based on his expert experience, not his feeling, so don't, look, let's be fair, let's not mischaracterize what he's saying.

VE:        Please, let's finish up.

ATTY:        I literally thought he said he felt that way. . . .

ALJ:        He did say that. He did say that, but he said a lot more than that . . . .

ATTY:        [I]s your methodology for getting the job numbers . . . solely you taking the job numbers given from the [BLS] and using your personal experience to, and I really want to search for the right word, Your Honor, to be accurate. To collect a number that you think is reasonable?

> VE:          Determine a number that's reasonable.  Yes, it is.

(Id. at 1141-42.)  But Angela's attorney pressed on:

> ATTY:      Are there any calculations or theorems or mathematical[]
> probabilities that are utilized within the [VE] community
> that you can use to come up with numbers that reasonably
> reflect your experience in the national economy?
>
> VE:          No, I use what I use, and I've been doing it for 32 years.  I
> use what I use and most [VEs] use much broader statistical
> areas that they look at.  And, no, I use per the DOT, I break
> it down much more than a lot of other [VEs] do.  So that's
> what I use.
>
> ATTY:      And since you break down much more than other [VEs], if
> the Judge were to ask you to put your calculations on paper
> to show your work essentially, would you be able to do so?
>
> VE:          Yes. . . .  It would take a while but I could do it, yes.

(Id. at 1142.)  Angela's attorney then asked the VE to explain what this process and

those calculations entailed:

> ATTY:      Okay.  So, there is actual calculations that went into this.
> It wasn't just based off of extrapolating from your 30 years
> of experience?
>
> VE:          Yes, I calculate based on my 32 years of experience.
>
> ATTY:      Okay.  So, for example . . . we'll take the school bus monitor
> job, how did you get from the total number from the SOC
> code to 28,000?  Can you walk us through your
> calculations?
>
> VE:          No, I cannot walk you through calculations.  I can just tell
> you that based on five occupations in that SOC code, I
> broke it down, and I said 28,000 was fair for school bus
> monitors.  And that's all I'm saying.
>
> ATTY:      Well, then what would you need to utilize more time for in
> order to provide detail[ed] work?  To give your calculations.

VE:        Well, it would be –

ALJ:       No, no, he's answered the question; it's an estimate.

ATTY:     Okay.  Okay.

ALJ:       It's an estimate on the [BLS] number.  And again, if you want to argue –

ATTY:     I get it.

ALJ:       -- that, you know, if . . . you have an argument to make, you make the argument for the Court that the estimate is unreliable.  But . . . he's given his testimony and he's explained how he arrived at the numbers. . . .  [I]f you have an argument [that] his estimate [is] not . . . substantial evidence then make it to the Court, right?  I mean, I don't know how much more he can possibly say about it.  I think he's been clear and articulate about how he arrived at the number, you know?

VE:        I need to get some food before the next hearing too, so. . . .

ATTY:     So, I will rest my cross-examination, but I am going to object based on the *Biestek v. Berryhill* doctrine which says that a [VE] must be prepared to cordially and thoughtfully discuss both the sources and methods.  And while we may respectfully disagree, I do believe that sources were accurately identified but I believe no method was identified that substantiates the job numbers, so I will raise that objection.

(Id. at 1143-44.)

The ALJ overruled Angela's methodology objection in his decision, concluding that the VE "explained the basis of his testimony" regarding job numbers "in detail," relying on "his personal observation of the jobs," "decades of experience," and the BLS to "break[] the SOC codes and mak[e] individual calculations for each job identified." (Id. at 1078.)  The ALJ also noted that the Seventh Circuit had not barred the use of

the so-called "equal distribution method" for estimating job numbers, emphasized the VE's testimony that he "tended to be more conservative than other [VE]s" so his estimates were also "more limited," and concluded that the VE's testimony was "uncontroverted, reliable and proper" and thus "persuasive." (Id.) The court disagrees.

"[W]hen, as here, the claimant challenges the job-number estimate," the ALJ "has a duty to spend time inquiring into the [VE]'s methodology" and "must compel [the VE] to offer a 'reasoned and principled explanation'" of the same. *Ruenger*, 23 F.4th at 763-64. To satisfy that duty, the ALJ may need to "ask more questions of [VE]s or slow down proceedings to give claimants a greater opportunity to pose their own questions" to avoid "shifting the agency's evidentiary burden to the claimant." *Id.* at 764. Not only did the ALJ in this case fail to ask a single substantive question about the VE's methodology, but as the record reflects, he also interrupted, attempted to speed up, and eventually halted the questions regarding the same. In fact, in an apparent effort to hurry the hearing along, the ALJ even guided the VE's testimony, asking leading questions to correct errors therein concerning the interaction between the DOT and BLS job number estimates. (A.R. 1133.) For his part, the VE also seemed eager to avoid questions and to terminate the examination as quickly as possible.

Further, while the ALJ seems to suggest that the VE employed the equal distribution method to arrive at his estimates, that method—which has itself been subject to scrutiny—involves "simply divid[ing] the number of jobs estimated for an

16

SOC code by the number of DOT titles contained within that SOC code," and does not represent the methodology used by the VE here. *Ruenger*, 23 F.4th at 762 (noting that the Seventh Circuit has "repeatedly questioned the accuracy of the equal distribution method" because it "illogically assumes . . . each DOT job title within an SOC code exists in equal numbers"). What the VE did do, however, remains a mystery. Indeed, he seemed to correct and conform his testimony to the information as it came to him questioning. (See, e.g. A.R. 1135 (VE indicating that all 24 occupations under SOC code that included photofinishing clerk position were "in line" with hypothetical, but later correcting answer to 8 after Angela's attorney pointed out that many were medium exertional level work and/or beyond the SVP level attributable to the hypothetical RFC).)

And while the ALJ states that the VE "noted his personal observation of the jobs," (id. at 1078), the court questions how observing a particular person performing a particular job translates to a reliable job number estimate and disagrees that the VE's testimony reflects that he did so in a meaningful way. The VE indicated he had seen the greeter job being performed at Wal-Mart and Costco and witnessed a photofinishing clerk in action at a Walgreens "several weeks ago." (Id. at 1130-32.) But as discussed, the ALJ did not rely on the photofinishing job to conclude that Angela is not disabled, and the VE admitted that he was not aware of any schools employing a full-time school bus monitor, (id. at 1140), and was not familiar with labor studies on any of the various positions, (id. at 1132). Other than these so-called

"observations," the VE essentially pointed only to his "feeling" about the numbers and his experience placing workers in jobs for over 30 years. (See, e.g., id. at 1135.)

VEs who rely on their "experience" must explain *how* that experience guided their estimates. *Rennaker v. Saul*, 820 Fed. Appx. 474, 479 (7th Cir. 2020) ("[A]lthough a VE may draw from his expertise to provide a reasoned basis for his job-number estimates, the VE in this case did not bring any aspect of his experience to bear on the reliability of those numbers."). The VE in this case failed in that regard, as did the ALJ in his duty to shed light on the methodology used. It is therefore immaterial that the VE deemed his own estimates "conservative.". *See Scott W. v. Kijakazi*, No. 21 CV 2663, 2023 WL 8807280, at *6 (N.D. Ill. Dec. 20, 2023) (VE's estimate as "conservative" did not resolve reliability concerns).

The government defends the VE's testimony based on his training and qualifications, (see R. 17, Govt.'s Mem. at 8 (noting VE is a "trained rehabilitation counselor" with a master's degree in counseling psychology and "more than three decades" of experience)), but "a VE's experience and qualifications alone cannot establish substantial evidence when he does not explain how that experience informs his methodology," *Hohman v. Kijakazi*, 72 F.4th 248, 253 (7th Cir. 2023). Simply put, the VE failed to cogently or thoroughly explain his methods. *Carla S. v. O'Malley*, No. 20 CV 3755, 2024 WL 113961, at *12 (N.D. Ill. Jan. 10, 2024) (finding ALJ's step-five finding lacked support of substantial evidence where VE used equal distribution method and provided "no explanation or further demonstration of why" that methodology was reliable); *Scott W.*, 2023 WL 8807280, at *6 (remanding where VE

did not elaborate on how experience helped narrow 600,000 jobs from applicable SOC code to 8,000 for relevant DOT code).  As such, the ALJ's step five decision lacks the support of substantial evidence, and remand is proper on this ground.[5]  *Chavez*, 895 F.3d at 968 (substantial evidence standard requires ALJ to "ensure that the approximation [of job numbers] is the product of a reliable method"); *Rennaker*, 820 Fed. Appx. at 478 ("A finding based on unreliable VE testimony is not based on substantial evidence and must be vacated.").

## B.    Opinion Evidence

Angela argues that the ALJ erred when assessing the September 2017 opinion of her treating surgeon, Dr. Sompalli.  (R. 11, Pl.'s Mem. at 13-15.)  In cases filed before March 27, 2017, such as Angela's, a treating physician's opinion is generally entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (internal quotation and citation omitted).  However, "once well-supported contradicting evidence is introduced," the treating physician's opinion "becomes just one more piece

---

[5]  Angela also asserts that the ALJ "should have known" that the VE's job-number estimates were not reliable because he used "suspiciously round numbers."  (R. 11, Pl.'s Mem. at 4.)  But "the reliability of a VE's job-number estimate 'does not require meeting an overly exacting standard,' as the 'law recognizes and respects' the 'realities and limitations' of calculating the number of jobs available for a claimant to work." *Hohman*, 72 F.4th at 253 (quoting *Chavez*, 895 F.3d at 968); *see also Fetting v. Kijakazi*, 62 F.4th 332, 339 (7th Cir. 2023) (finding that "precise count is not necessary," so long as job-number testimony is "supported with evidence sufficient to provide some modicum of confidence in its reliability" (internal quotations and citations omitted)).

19

of evidence for the ALJ to consider." *Bates v. Colvin*, 736 F.3d 1093, 1099-1100 (7th Cir. 2013) (internal quotation and citation omitted); *Ray v. Saul*, 861 Fed. Appx. 102, 105 (7th Cir. 2021). When evaluating the weight to afford that opinion, the ALJ considers: (1) the length of treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) physician's specialization, if any; and (6) other factors "which tend to support or contradict" the opinion. 20 C.F.R. § 404.1527(c). The ALJ need not discuss every factor, however, and the Seventh Circuit "uphold[s] all but the most patently erroneous reasons for discounting a treating physician's assessment," *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (internal quotation and citation omitted), so long as the ALJ "minimally articulated his reasons—a very deferential standard," *Elder v. Astrue*, 529 F.3d 408, 418 (7th Cir. 2008) (citation omitted). The ALJ did so here.

Among other things, Dr. Sompalli opined that Angela was unable to carry any weight or use her right hand, could stand and walk for only two hours in a workday, would be off task more than 25% of the time, required unscheduled 15-minute breaks every hour, and would miss more than four workdays per month. (A.R. 459-61.) Dr. Sompalli also reported that Angela was in "10/10 constant pain," and that the symptoms and limitations he notes date back to February 2017. (Id. at 458, 462.)

The ALJ gave "limited weight" to Dr. Sompalli's opinion, noting that his assessment included diagnoses related to Angela's right shoulder only—not her left upper or her lower extremities. (Id. at 1073.) The ALJ also pointed out that Dr. Sompalli's contact with Angela related to her right shoulder "was limited to

having performed the surgery" in July 2017, having seen her just once before her procedure, once soon afterward, again a month later—when he noted that Angela appeared well and had a normal gait—and once more a week before he prepared his opinion. (Id.) The ALJ noted that despite the significant restrictions assessed, at the time of his opinion Angela was less than three months post-surgery and still in physical therapy—with therapy notes reflecting "ongoing improvement"—and that he described Angela's prognosis as "good." (Id.) The ALJ further reasoned that, "contravening an assertion of debilitating pain likely to interfere with being on task or present," Angela reported pain of just 4 out of 10 to Dr. Sompalli a week before his opinion, and aside from Tylenol and Mobic on a temporary basis, medications "were not re-prescribed." (Id.) The ALJ also noted that Dr. Sompalli's treatment notes provide no "reasoned basis" for "0% use of right hand, more than 4 absences, and standing/walking deficits of less than 2 hours." (Id. at 1074.)

Angela does not contend that Dr. Sompalli's opinion warrants controlling weight, but argues that the ALJ erred when discounting the opinion because: (1) he deemed the limitations Dr. Sompalli assessed "not permanent," even though Angela amended her claim to seek benefits for a closed period; (2) he deemed the opinion less weighty because he only examined Angela a few times, but then afforded greater weight to the agency physicians' opinions even though they never examined her; and (3) he found that Dr. Sompalli's treatment notes inconsistent with his opinion. (R. 11, Pl.'s Mem. at 14-15.) The court disagrees that the ALJ erred.

First, there was nothing improper about the ALJ describing Dr. Sompalli's assessed restrictions as "temporary." (A.R. 1073-74.) After the ALJ explained why he doubted the need for those restrictions, he indicated he was even more confident in his conclusion after the original hearing that those restrictions were temporary in nature—noting that physical therapy notes reflect Angela's "ongoing improvement" during the post-surgery recovery phase and her return to work in fall 2018 performing tasks contrary to Dr. Sompalli's severe restrictions. (Id.)

Nor did the ALJ treat Dr. Sompalli's limited contact with Angela unfairly as she asserts. (R. 11, Pl.'s Mem. at 14; R. 18, Pl.'s Reply at 7-8.) To be sure, the ALJ noted that Dr. Sompalli had treated Angela previously, but correctly found that the right shoulder issues highlighted in his opinion were Dr. Sompalli's only focus in and around the surgery he performed, and his opinion itself states that the limitations and symptoms described extend only as far back as February 2017. (A.R. 1073.) As discussed, then-applicable regulations directed the ALJ to consider the extent of Angela's treatment relationship with Dr. Sompalli in assessing his opinion. *See* 20 C.F.R. § 404.1527(c).

And while Angela says the ALJ acted inconsistently when he afforded "significant weight" to the state agency physicians' opinions even though they did not examine Angela at all, the court disagrees here too, because as the ALJ notes, those opinions were based on a review of the full medical record up to that point, generally consistent with the same, and were given weight only for that period. (A.R. 1076); *see also Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) (noting "[i]t is

appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation" and "that these physicians reviewed the entire record strengthens the weight of their conclusions"). In fact, the ALJ noted that more recent evidence support "additional manipulative limitations" beyond those proposed by the agency consultants and included them in the RFC. (A.R. 1066, 1076.)

Angela's third argument—that the ALJ erroneously found Dr. Sompalli's opinion inconsistent with his treatment notes—fares no better. Angela says the ALJ was "splitting hairs unfairly" in concluding that Dr. Sompalli's "off task" and absence limitations were not supported by his treatment notes. (R. 11, Pl.'s Mem. at 14-15 (citing A.R. 1073 and *Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016)).) But as discussed, the ALJ pointed out that Dr. Sompalli was treating only Angela's right upper extremity, yet imposed limitations reaching well beyond that treatment, and a week before rendering his opinion Angela reported improvement with physical therapy, rated her pain as 4 out of 10, and Dr. Sompalli did not refill her pain medications. (A.R. 1073 (citing id. at 583-84).) In sum, the ALJ more than minimally articulated his reasons for concluding that Dr. Sompalli's opinion was not supported by the record, and substantial evidence supports that assessment.

## C.    **Subjective Symptom Assessment**

Angela complains about the ALJ's assessment of her subjective symptoms. (R. 11, Pl.'s Mem. at 11-13.) An ALJ's symptom evaluation is entitled to great deference and may only be reversed where "patently wrong." *Murphy v. Colvin*, 759

F.3d 811, 815-16 (7th Cir. 2014). But the ALJ may not disregard subjective complaints "solely because they are not substantiated by objective medical evidence," *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015), and must consider factors such as medication efficacy and side effects, daily activities, treatment received, and precipitating pain factors, SSR 16-3p, 2017 WL 5180304, at *7-8 (Oct. 25, 2017). That said, the court will not disturb an ALJ's subjective symptom evaluation if it is logically based on specific findings and record evidence. *See Murphy*, 759 F.3d at 815.

Angela asserts that the ALJ "recited no . . . objective medical evidence during the closed period" to support his assessment that Angela's "statements concerning the intensity, persistence and limiting effects" of her symptoms were "not entirely consistent with the medical . . . and other evidence of record." (R. 11, Pl.'s Mem. at 11-13; R. 18, Pl.'s Reply at 9 (citing A.R. 1068).) Angela also says that the ALJ ignored the level at which she performed daily activities, and improperly relied on her return to work after the closed period, ignoring that she worked alongside her sister doing "less than sedentary tasks based on Jewel Osco's practice of accommodating special needs employees." (R. 11, Pl.'s Mem. at 11-13.)

The court agrees that it would be wrong to rely solely on a claimant's return to work after the closed period for which she seeks benefits to discount her allegations during the claim period. *See Brown v. Massanari*, 167 F. Supp. 2d 1015, 1020 (N.D. Ill. 2001) (noting that ALJs may not conflate evidence during and after closed period). However, the court disagrees that evidence of Angela's limitations from just after the closed period is irrelevant to whether she was disabled days or even months earlier.

*Cf. Robert M. W. v. Saul*, No. 19 CV 3165, 2020 WL 6801842, at \*5 (N.D. Ill. Nov. 19, 2020) ("To the extent the ALJ is suggesting that this evidence can be ignored simply because it predated [claimant's] alleged disability onset date, the Court disagrees. This evidence is part of the relevant inquiry, along with the evidence after the alleged onset date."). Further, Angela fails to mention that she returned to work during the closed period. (See A.R. 1100 (Angela indicating that she began work at Jewel-Osco on September 29, 2018).) Thus, the ALJ did not err simply because he considered Angela's return to work when assessing her credibility.

The ALJ also did not ignore how Angela claims to perform her job as she asserts. Instead, after summarizing Angela's testimony about the same, the ALJ noted that Angela "provided no evidence" from her employer or treatment providers that her work is "accommodated in any way," and explained that even if performed as she described, her job requires "greater exertional and non-exertional activity" than the RFC he assessed.[6] (Id. at 1064, 1067-68.) Angela may have preferred a different conclusion, but the court cannot direct it. *See Deborah M.*, 994 F.3d at 788 (court will not reweigh evidence).

Moreover, it is axiomatic that ALJs "are subject to only the most minimal of articulation requirements," *Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024), and having also considered medical and other evidence during the closed period, the

---

[6] Further, while Angela specifically complains that the ALJ relied on her testimony that she climbs ladders at her job to discount her testimony about symptoms during the closed period, (R. 11, Pl.'s Mem. at 12), the ALJ's RFC precludes Angela from ever climbing ladders, so any error in that regard is harmless, (A.R. 1066, 1068).

ALJ met that standard here. Indeed, the ALJ described much of the objective evidence across several pages, noting in particular that during the relevant period: (1) diagnostic imaging of Angela's joints was mostly unremarkable (while acknowledging when it was not); (2) Angela did not receive treatment for her left shoulder; (3) treatment for hip issues was minimal to non-existent and her gait was frequently described as "normal"; (4) Angela recovered from a sprained ankle and reported her pain was "0" after four weeks of physical therapy; (5) Angela did not report any issue with her right shoulder until February 2017 and after surgery indicated her pain and mobility improved with physical therapy; (6) when Angela asked to restart physical therapy, she reported mild to moderate pain that improved with therapy; and (7) on multiple occasions outside of her initial surgery recovery period, Angela reported minimal to no shoulder or other pain, that she was feeling "well," and not taking any pain medication or taking only Tylenol. (A.R. 1068-72, 1074-75.) The fact that the ALJ discussed inconsistencies throughout his decision instead of addressing them all in assessing her subjective symptoms is not problematic because the court must consider the ALJ's decision as a whole. *See*, e.g., *Rice v. Barnhart,* 384 F.3d 363, 370 n.5 (7th Cir. 2004) ("[I]t is proper to read the ALJ's decision as a whole, and . . . it would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five.").

The ALJ considered other factors in addition to the objective medical evidence and Angela's treatment history and medication. To be sure, the ALJ considered the precipitating factor of Angela's fall in February 2017 and her daily activities.

(A.R. 1068.) And while Angela asserts that the ALJ ignored her testimony that she was unable to perform household chores and "only started cleaning . . . again in 2020," (R. 11, Pl.'s Mem. at 12 (citing A.R. 1020)), the ALJ relied on Angela's December 2016 function report when assessing her credibility, noting that even then she cleaned the house, did laundry, and prepared meals to the extent that she could. (A.R. 1068 (citing id. at 313-24).) Finally, the ALJ stated he was "not equating daily activities with work activity," and those activities were just one of several factors causing him to question Angela's reports. (Id. at 1068.) Accordingly, the ALJ's subjective symptom assessment was not patently wrong. *See Halsell v. Astrue*, 357 Fed. Appx. 717, 722 (7th Cir. 2009) (affirming symptom assessment despite flawed daily living activities analysis because "[n]ot all of the ALJ's reasons [for disbelieving a claimant] must be valid as long as *enough* of them are") (emphasis in original)).

## Conclusion

For the foregoing reasons, this matter is remanded for further proceedings consistent with this opinion.

**ENTER:**

_Young B. Kim_
**Young B. Kim**
**United States Magistrate**